2025 IL App (1st) 231153-U

SECOND DIVISION
August 26, 2025

No. 1-23-1153

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit |
| | ) Court of Cook County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 13 CR 0053901 |
| | ) |
| SHAWN STUBBLEFIELD, | ) |
| | ) Honorable Lawrence E. Flood, |
| Defendant-Appellant. | ) Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm in part, vacate in part, and remand the case for a new sentencing hearing. We affirm defendant's conviction for aggravated criminal sexual assault with kidnapping as the predicate felony; we presume the trial court considered the other crimes evidence for its proper purpose; defendant's claim of ineffective assistance of counsel on allegations of failing to impeach the victim's testimony fails; we vacate defendant's sentence and remand for resentencing because the trial court improperly applied a sentencing enhancement to defendant's sentence that did not apply.

¶ 2    Following a bench trial, defendant Shawn Stubblefield was found guilty of aggravated criminal sexual assault, kidnapping, robbery, and unlawful restraint. He was sentenced to 35 years in prison. Defendant now appeals his conviction and sentence. Defendant argues that the trial court improperly allowed other crimes evidence to be used to show defendant's propensity

to commit sex offenses when the other crimes evidence did not meet the statutory requirements to be used as propensity evidence. Defendant argues that his trial counsel was ineffective for failing to complete the impeachment of the victim after the victim provided an inaccurate description of defendant to the police when she reported the crime. Defendant argues that the physical lineup in which he was identified was unduly suggestive because he was the tallest participant in the lineup and no other participants had both dreadlocks and a dark-colored hoodie as the offender was described to have had at the time of the crime. Defendant argues that the trial court improperly applied a 15-year firearm enhancement to his sentence despite the fact that the offense for which he was convicted includes no such enhancement. Finally, defendant argues that his kidnapping conviction must be vacated under the one-act, one-crime doctrine because kidnapping was also the predicate felony for his aggravated criminal sexual assault conviction.

¶ 3     For the following reasons, we affirm defendant's conviction for aggravated criminal sexual assault with kidnapping as the predicate felony. We vacate defendant's sentence for that aggravated criminal sexual assault conviction because the trial court improperly applied the firearm sentencing enhancement to defendant's sentence where the offense underlying the conviction did not support the application of the sentencing enhancement. We also vacate defendant's kidnapping conviction because it cannot stand as it violates the one-act, one-crime doctrine where kidnapping was the predicate felony for defendant's other conviction. Having vacated defendant's sentence, we remand for a new sentencing hearing.

¶ 4                              BACKGROUND

¶ 5     On December 3, 2012, C.H., a 13-year-old girl, was walking the two or three blocks from her apartment to the bus stop to start her day of middle school. She noticed someone walking behind her and she turned around and saw defendant. Defendant began to get closer, so C.H.

- 2 -

crossed the street, but defendant followed her. C.H. tried to take out her cellphone, but defendant caught up to her, told her he had a gun, and ordered her to come with him to his car. Defendant then dragged C.H. to his vehicle. Defendant's vehicle was a white, four-door, "older kind of car" with a bench seat in the front. After C.H. was inside the car, defendant ordered her to pull down her pants, and he pulled down his pants as well. Defendant then put his hand on the back of C.H.'s head and forced her to perform oral sex on him. Defendant ejaculated into her mouth.

¶ 6 Defendant then drove C.H. to her house. C.H. testified that defendant drove to her house without asking directions because he said he knew where she lived because he had been watching her. He instructed her to go inside and get money for him and threatened to burn down her apartment building if she failed to comply. When C.H. went into her apartment, her cousin Tawana Cross was there. C.H. told Tawana what happened, and Tawana called the police. When the police arrived, defendant was gone. C.H. went to the hospital where a sexual assault kit was completed.

¶ 7 Another girl, 17-year-old M.N., was walking to the bus to go to school the same day, December 3, 2012. She noticed a white "old school" four-door Cadillac with dark tinted windows parked almost directly across the street from her house. The car was running and someone was sitting inside. As M.N. continued towards the bus stop, defendant exited the vehicle and began walking behind her. Defendant asked M.N. her name, but she did not respond and continued walking. Defendant approached her, grabbed her, and pulled her into the doorway of a building. M.N. started screaming, and defendant covered her mouth with his hand. She bit his hand and began to pull at his dreadlocks. Defendant continued to hold onto M.N. and he stuck his hand down her pants and inserted his finger into her vagina.

¶ 8       M.N. was able to break free from defendant and she ran into the street. Defendant was holding onto M.N.'s backpack and he tried to convince her to come back to him and retrieve it, but she refused. Defendant hung the backpack on a gate and started to walk back to his vehicle. M.N. was then able to go back and retrieve her backpack. Defendant then tried to approach M.N. again and he said he was sorry, that he did not mean to do what he did, and that he was drunk. M.N. went back home, called the police, and told them what happened. She then went to the hospital, and a sexual assault kit was completed.

¶ 9       Two days later, on December 5, 2012, a young teenager, J.C. was walking to school when she noticed defendant in front of her. J.C. decided to cross the street, but defendant followed her. Defendant put his arm around J.C. and asked her for her name. She did not respond. Defendant told J.C. that he had a gun and that she was coming with him. J.C. began to scream, and defendant put his hand over her mouth. She bit him and was able to break free from him. She ran into the street and flagged down a passing car. The woman driving the car stopped and let J.C. into the vehicle. The woman then drove J.C. to the police station where she told the police what happened. She told the police that defendant drove a white, older vehicle and had dreadlocks.

¶ 10    Shortly after J.C. was approached, a 13-year-old girl, I.M. was walking to school. As she was walking, defendant exited a white four-door sedan and approached her from behind. Defendant put his hand over her mouth and told her he had a gun. Defendant started forcefully pulling I.M. towards his vehicle. As I.M. began screaming and struggling with defendant, a woman in a Honda minivan drove by and made direct eye contact with I.M. Defendant realized the woman had seen what was occurring, so he released I.M. I.M. ran to the woman's minivan and got into the front passenger seat. At the same time, defendant returned to his vehicle and

drove away. The woman who saved I.M. called the police and she began to follow defendant's vehicle as he fled. The woman gave the police the license plate number, and she then returned to the scene of the assault so that I.M. could meet with the responding officers.

¶ 11    A River Forest Police Officer, Glen Czernick, was traveling in his squad car on the morning of December 5, 2012 when he heard the radio dispatches about two attempted child abductions that had occurred that morning. The dispatches stated that the offender was a black male driving a white, older, boxy-style vehicle. Officer Czernick saw a vehicle matching that description and curbed the vehicle. Officer Czernick announced on the radio that he had stopped a vehicle matching the description of the one associated with the attempted child abductions. J.C. was meeting with police officers at the station reporting what had happened to her. The officers brought her to the scene where defendant was stopped, and she immediately pointed at defendant and identified him and the vehicle without being prompted by the officers. I.M. was also brought to the scene. I.M. stated that she did not get a good look at defendant's face during the attack, but the man the police had stopped had the same skin tone, hairstyle, stature, and type of clothes worn by the man who attacked her.

¶ 12    Defendant was arrested and brought to the Oak Park police station. Oak Park Police Department Commander Shatonya Johnson was aware that the Chicago Police Department was looking for a suspect who matched defendant's description, so she informed the police in Chicago about the arrest.

¶ 13    Commander Johnson met with defendant, read him his *Miranda* rights, and questioned him about the attacks against J.C. and I.M. Defendant initially denied any involvement in the crimes, but later admitted that he approached the two girls and attempted to pull them into his car. Defendant agreed to give a written statement to Assistant State's Attorney Barry Quinn.

ASA Quinn typed the statement as defendant recounted the events about the attacks. Defendant then made a couple corrections and signed the statement. ASA Quinn and Commander Johnson signed the statement as well.

¶ 14    In his written statement, defendant recounted that, on the morning of December 5, 2012, he was driving a white Cadillac when he noticed J.C., who he described as an "attractive girl," walking past a McDonald's restaurant. He stopped his car, approached J.C., and asked for her name. Defendant pulled J.C. towards him and told her that he had a gun, but she twisted herself away from him and flagged down a passing vehicle. Defendant returned to his vehicle and left the area. Defendant acknowledged that he was "too aggressive" with J.C. and that it was wrong for him to approach her and tell her that he had a gun.

¶ 15    Defendant continued his statement by stating that, approximately 15 minutes later, while he was driving, he noticed I.M., another "attractive girl" who was his "type." She looked young and had "a nice, little body." He stopped his vehicle, approached her from behind, grabbed her, and pulled her towards him. I.M. began yelling and ran away from him. She flagged down a passing car and defendant returned to his vehicle and fled. He was aware that the car that I.M. flagged down started following him so he drove evasively. Shortly thereafter, a River Forest Police officer pulled him over. Defendant admitted that his conduct towards J.C. and I.M. was wrong and that he "fucked up" by mentioning that he had a gun.

¶ 16    Detective Jacqueline Mok from the Chicago Police Department was assigned to investigate the attacks on C.H. and M.N. that happened on December 3, 2012. After interviewing the girls, she determined that the cases were probably related because the physical description of the offender was similar in both cases, as was the description of the vehicle and the *modus operandi*. Detective Mok put out a community alert describing the offender, the vehicle, and the

crimes. On December 5, 2012, Detective Mok received word that the Oak Park Police had arrested a suspect who matched the description of M.N. and C.H.'s attacker. Detective Mok went to the Oak Park police station to interview defendant. Defendant initially denied any involvement in the attacks on M.N. and C.H. but later agreed to give another statement to ASA Quinn. ASA Quinn typed the statement as defendant gave it and then defendant, ASA Quinn, and Detective Mok all signed the statement.

¶ 17    According to his written statement, defendant was driving the white Cadillac when he saw an attractive girl with a backpack. Defendant identified a photo of C.H. as the girl he saw. He got out of his car, approached her, put his arm around her, and asked for her name. C.H. asked who he was and if he was going to hurt her. Defendant told her he was not going to hurt her, but when she asked if he had a gun, he replied that he did. Defendant told C.H. some things that would scare her, such as that he had been watching her. C.H. performed oral sex on him and he masturbated until he ejaculated. He then told her he would drive her home so she could get money for him. He waited outside for her, but when she did not return he moved his car to a nearby location. He then saw the police coming, so he struck up a conversation with a woman who was outside so the police would not notice him. Defendant admitted that what he did to C.H. was "wrong."

¶ 18    C.H. and M.N. went to the police station in Oak Park and separately viewed physical lineups. Both girls identified defendant as their attacker. The police also had them view defendant's vehicle and they identified the car with C.H. identifying it as the place where her assault took place and M.N. identifying it as the car defendant was driving when he attacked her.

¶ 19    Defendant was charged for his attack on C.H. and the case was proceeding towards trial. Prior to trial, the State filed a motion to admit other crimes evidence. The State sought to

introduce evidence at trial that defendant attacked three other young girls, with M.N. being attacked the same day as C.H., and J.C. and I.M. being attacked two days later. The State argued in its motion that defendant's attacks on M.N., J.C., and I.M. were admissible under section 115-7.3 of the Code of Criminal Procedure (725 ILCS 5/115-7.3 (West 2022)) to show his propensity to commit sexual assault. The State further argued that evidence of the other attacks was relevant and admissible under Illinois Rule of Evidence 404 (West 2022) (eff. Jan. 1, 2011) to prove defendant's identity as the perpetrator as well as his intent, motive, *modus operandi*, and the absence of an innocent frame of mind.

¶ 20    Defendant argued that the events identified by the State were not similar enough to the charged offense to be admissible for propensity purposes. He also argued that he would suffer substantial prejudice if the evidence of the other crimes was admitted and that the evidence was substantially more prejudicial than probative. The trial court granted the State's motion and permitted the State to introduce the other crimes evidence at trial.

¶ 21    Thereafter, defendant filed a motion to suppress evidence of the lineup identifications made by C.H. and M.N. on the basis that the lineup was unnecessarily suggestive. Defendant argued in his motion that he was the tallest person in the lineup and only one of the other men in the lineup had dreadlocks. The trial court denied the motion to suppress the lineup identifications.

¶ 22    The case proceeded to a bench trial. The court heard evidence of the four assaults that took place on December 3 and December 5, 2012. After the State introduced evidence consistent with the above facts, defendant presented his defense. Defendant's cousin, Christopher Hall, testified in defendant's defense. Hall testified that defendant lived with him at his apartment in Chicago. Defendant had recently moved back to Chicago after living for a period in Milwaukee.

Hall woke up at 6:45 a.m. on December 3rd to get ready for work. According to Hall, defendant was planning to go look for a job that day with his friend Drayon. Drayon owned a white Cadillac and physically resembled defendant, as they had similar builds and were the same height.

¶ 23 Hall testified that he left the apartment between 7:45 a.m. and 8:00 a.m. on December 3, 2012 and defendant was still in the apartment at that time. M.N. had testified that she was approached by defendant just after 6:15 a.m. and C.H. testified she was approached by defendant just after 7 a.m. Hall could not recall defendant's whereabouts on December 5, 2012 because it was so long ago. Hall testified that he did not come forward sooner to present the alibi for defendant because Hall had a warrant out for his own arrest and had other events going on in his life such that he did not want to be apprehended by authorities.

¶ 24 Defendant testified in his own defense. Defendant testified that he never owned a white Cadillac, but his friend Drayon did. According to defendant, Drayon was similar in size to him and had shoulder-length dreadlocks. Defendant testified that he was pulled over while he was driving Drayon's car while he was out looking for a job and he had borrowed Drayon's car because his car was out of commission. Defendant denied that he had ever seen C.H., M.N., J.C., or I.M. at any time prior to trial.

¶ 25 Defendant admitted that he talked to police but denied making the majority of the statements attributed to him in the written statement. He testified that he told ASA Quinn about his family and his schooling but did not tell him the other things in the statement. Defendant maintained that Quinn only went over the first page of the statement with him and he signed the statement without reading it. He denied making corrections to the statement, and when he was

shown photos of the accusers he told the ASA that he did not know them. Defendant stated that ASA Quinn told him to sign the photos to signify that they had been shown to him.

¶ 26     There was no indication of semen on the oral swab C.H. gave as part of the sexual assault kit. There was likewise no indication of semen on her clothing.

¶ 27     The trial court found defendant guilty on three separate types of aggravated criminal sexual assault on C.H. based on the forced oral sex, kidnapping, robbery, and unlawful restraint. The trial court sentenced defendant to 35 years in prison for aggravated criminal sexual assault predicated on kidnapping and three years in prison for kidnapping. The trial court merged the remaining convictions. Defendant now appeals his convictions and sentence.

¶ 28                                    ANALYSIS

¶ 29     As for his convictions, defendant argues that he is entitled to a new trial because the trial court improperly allowed the other crimes evidence from I.M. and J.C. to be used as propensity evidence. Defendant also argues that he is entitled to a new trial because his trial counsel was ineffective for failing to perfect impeachment of C.H.'s testimony. Defendant argues that the trial court erred when it denied his motion to suppress the lineup identifications because the lineup was unduly suggestive. As for his sentence, defendant argues that the trial court improperly applied a 15-year firearm enhancement to his aggravated criminal sexual assault conviction. Finally, defendant argues that his kidnapping conviction must be vacated under the one-act, one-crime doctrine since kidnapping is a lesser-included offense of criminal sexual assault predicated on kidnapping.

¶ 30     *Other Crimes Evidence*

¶ 31     Defendant argues that the trial court improperly allowed the other crimes evidence from I.M. and J.C. to be used as propensity evidence under section 115-7.3 of the Code of Criminal

Procedure (725 ILCS 5/115-7.3 (West 2022)) where neither I.M. nor J.C. alleged that defendant committed an offense for which that section applies. The State argues that defendant has forfeited the argument that the evidence was inadmissible under section 115-7.3 of the Code of Criminal Procedure because he never made that argument in the trial court.

¶ 32     Generally, the State may not introduce evidence that the defendant has committed other crimes in order to show that he has the propensity to commit the charged offense. *People v. Donoho*, 204 Ill. 2d 159, 172 (2003). Section 115-7.3 of the Code of Criminal Procedure, however, includes a limited exception to the general prohibition on propensity evidence for certain sex offenses. *Id.* To paraphrase for purposes of this case, the statute says if a defendant is charged with aggravated criminal sexual assault, evidence of the defendant's commission of another enumerated sex offense may be admissible and may be considered for its bearing on any matter to which it is relevant, including the defendant's propensity to commit sex offenses. See 725 ILCS 5/115-7.3 (West 2022); *Donoho*, 204 Ill. 2d at 176 ("the legislature enacted section 115–7.3 to enable courts to admit evidence of other crimes to show defendant's propensity to commit sex offenses if the requirements of section 115–7.3 are met."). Defendant, however, argues that I.M. and J.C., at most, described attempted kidnappings, not criminal sexual assault, which do not meet the requirement for admissibility as propensity evidence under the statute.

¶ 33     On appeal, the State points out that it argued in its pretrial motion that the evidence was admissible to prove defendant's identity as the perpetrator as well as his intent, motive, *modus operandi*, and the absence of an innocent frame of mind under Illinois Rule of Evidence 404.

> "(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by sections 115-7.3, 115-7.4, and 115-20

of the Code of Criminal Procedure (725 ILCS 5/115-7.3, 725 ILCS 5/115-7.4, and 725 ILCS 5/115-20). Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404 (West 2022) (eff. Jan. 1, 2011).

In granting the State's motion to introduce the other crimes evidence, the trial court found the evidence to be admissible under both section 115-7.3 *and* Illinois Rule of Evidence 404.

¶ 34     In response to the State's pretrial motion to admit other crimes evidence, defendant argued that the probative value of the other crimes evidence was outweighed by the prejudice. He did not specifically argue, as he does here, that the other crimes evidence offered by I.M. and J.C. did not meet the requirement for admissibility as propensity evidence under the statute. Indeed, defendant principally argued that the evidence could not be properly admitted as propensity evidence because the allegations made by the other girls were not substantially similar to those made by C.H.

¶ 35     As defendant points out, however, while he did not raise the exact same argument in the trial court that he raises here, he did argue in response to the State's motion that the evidence offered by I.M. and J.C. should not be admitted under section 115-7.3 as propensity evidence because "evidence of an alleged kidnapping with very different facts and allegations" from the aggravated criminal sexual assault at issue in this case would be unduly prejudicial. In his posttrial motion, defendant also argued that the other crimes evidence concerning the attacks on I.M. and J.C. should not have been permitted to be used in such a manner to show his propensity to commit sex crimes. We find that defendant's objections were sufficient to avoid forfeiting the issue he now raises. See *People v. Minter*, 2015 IL App (1st) 120958, ¶ 43 (a defendant need not

make an objection on identical grounds in the trial court in order to preserve the issue for appeal); see also *People v. Mohr*, 228 Ill. 2d 53, 65 (2008); *People v. Heider*, 231 Ill. 2d 1, 18 (2008).

¶ 36 Even though we find it is proper to address defendant's argument on the merits, we disagree with his contention that he is entitled to a new trial based on the admission of the other crimes evidence. As stated above, the trial court found the other crimes evidence offered by the State to be admissible under both section 115-7.3 *and* Illinois Rule of Evidence 404. Evidence of other crimes may not be introduced in an attempt to show a defendant's bad character. *People v. Walston,* 386 Ill. App. 3d 598, 609-10 (2008); see also Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). Other crimes evidence is admissible, however, when it is relevant for any purpose other than to show the defendant's propensity to commit a crime. *People v. Heard*, 187 Ill. 2d 36, 58 (1999); *People v. Robinson,* 391 Ill. App. 3d 822, 838 (2009). Other crimes evidence may be introduced against a defendant, for example, for the purpose of showing "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404 (West 2022) (eff. Jan. 1, 2011).

¶ 37 Defendant does not dispute that the evidence was admissible under Illinois Rule of Evidence 404. Instead, defendant contends that "it was error for the trial court to admit and consider the allegations as propensity evidence even though they were admissible for other non-propensity purposes under Rule 404." Defendant further contends that the other crimes evidence's "admissibility under Rule 404 [did not] render the error of their admission as propensity evidence necessarily harmless."

¶ 38 When the trial court granted the State's pretrial motion to admit other crimes evidence, it stated that the evidence was admissible as propensity evidence. Defendant contends that the

record does not establish that the trial court only considered the evidence for proper purposes and not as propensity evidence.

¶ 39    Our supreme court explained many years ago that "[e]vidence admissible for one purpose is not affected by inadmissibility for another." *People v. Carter*, 38 Ill. 2d 496, 504 (1967). We have recently applied this precept in several cases dealing with the admission of other crimes evidence. See *People v. Brown-Engel*, 2018 IL App (3d) 160368, ¶ 20; *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 51; *People v. Boyd*, 366 Ill. App. 3d 84, 91-95 (2006); *People v. Arze*, 2016 IL App (1st) 131959, ¶ 102. In *Brown-Engel*, we found the other crimes evidence admitted at trial under section 115-7.3 was inadmissible to show defendant's propensity to commit sex crimes because it was not evidence of an offense enumerated in the statute. *Brown-Engel*, 2018 IL App (3d) 160368, ¶ 19. However, even though we found the evidence should not have been admitted as propensity evidence, the evidence was admissible to show the defendant's intent and absence of an innocent state of mind under Rule of Evidence 404. *Id*. at ¶ 20. The other crimes evidence offered in *Brown-Engel* "fit[] squarely within the recognized exceptions [to the bar against evidence of a defendant's bad character], which allow such evidence to show defendant's intent or to show that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge." *Id*. at ¶ 22.

¶ 40    In *Brown- Engel*, we explained that "[a]s a reviewing court, we can sustain the decision of a lower court on any grounds which are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct." *Id*. at ¶ 20 (quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995)). Similarly, as is the case here, the defendant "suffered no prejudice because the possibility of prejudice inherent in a jury trial does not exist in a bench trial because it is

presumed that the circuit court considers only admissible evidence." *Id*. at ¶ 25.

¶ 41     Defendant attempts to distinguish this case from *Brown-Engel* by pointing out that the record in that case "demonstrate[d] that the prior bad acts evidence was only considered for the proper purpose of determining defendant's intent—not defendant's propensity to commit crimes." *Id.* ¶¶ 25–26. Defendant explains that, in this case, the record does not establish that the trial court only considered the evidence about the attacks on I.M. and J.C. only for proper purposes. While defendant is correct that the record here does not establish that the trial court considered the evidence only for its proper purposes under Rule of Evidence 404, the record similarly does not establish that the trial court improperly considered the evidence as propensity evidence. When a proper purpose for admitting evidence exists, in a bench trial, we presume that the trial court considered the evidence for its proper purpose. See *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 98 (because the case was tried to the bench, we begin with the presumption that the trial court considered the evidence only for its proper, limited purpose and that presumption may be rebutted only by an affirmative showing to the contrary from the record on appeal); see also *People v. Smart*, 2025 IL 130127, ¶¶ 93-94; *People v. Avery*, 227 Ill. App. 3d 382, 389 (1991). As the appellant, defendant has the burden of showing error, *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 48, and he failed to do so here.

¶ 42     Even if defendant had established error, the evidentiary error would have been harmless. If a trial court improperly admits other crimes evidence, we must determine whether a reasonable probability exists that the trial court would have acquitted the defendant if the court had excluded the evidence. *Smart*, 2025 IL 130127, ¶ 93. Even without any evidence about the attacks on I.M. and J.C., the evidence that defendant assaulted C.H. was overwhelming. First we consider the other crimes evidence from the attack on M.N, the admissibility of which was never challenged

by defendant. C.H. and M.N. both consistently identified defendant as the person who sexually assaulted them. They each separately identified defendant in a physical lineup and at trial as their attacker. They were both attacked in the early morning on their way to school. They both reported to the police in very similar terms the type of car defendant was driving, and they both identified the car after defendant was arrested.

¶ 43    Defendant's own statements would establish defendant's identity as the perpetrator in the attacks on C.H. and M.N. to any reasonable fact finder. Defendant gave a written statement to an Assistant State's Attorney in the presence of a detective and all three signed each page of defendant's statement. The details defendant gave in the statement aligned with what C.H. told the police and her cousin directly after the sexual assault took place. The improper admission of other crimes evidence warrants reversal only if the evidence was a material factor in the defendant's conviction such that without the evidence the verdict likely would have been different. *People v. Knight*, 309 Ill. App. 3d 224, 229 (1999). In this case, there is no likelihood that the outcome of the case would have been different, even if the evidence about the attacks on I.M. and J.C. was excluded. Any error would have been harmless beyond a reasonable doubt.

¶ 44    *Ineffective Assistance of Counsel*

¶ 45    Defendant argues that his trial counsel was ineffective for failing to perfect the impeachment of C.H. Both the United States and Illinois Constitutions guarantee a criminal defendant the right to the effective assistance of counsel at trial. U.S. Const. amends. VI, XIV; Ill. Const. 1970 art. I, § 8. To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27. The failure to satisfy both prongs

of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson,* 192 Ill. 2d 93, 107 (2000). We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010).

¶ 46    Defendant contends that his counsel did not adequately use C.H.'s prior statements about defendant's appearance to undermine her identification. The failure to make use of obviously useful impeachment against a key State witness can constitute a denial of effective assistance of counsel. *People v. Vera*, 277 Ill. App. 3d 130, 140 (1995).

¶ 47    C.H. told police that her attacker was 5'9" or 5' 10" with a dark complexion. Defendant is 6' 4" and is not dark complected. On cross-examination, C.H. was questioned by defendant's counsel about the description she gave to the police. C.H. acknowledged she told police that defendant had a dark complexion and admitted that defendant did not. C.H. asserted that she could not remember what she told police about defendant's height, and defendant's counsel did not bring up that C.H. had described her attacker to police as half-a-foot shorter than defendant. C.H. also testified at trial that her attacker was wearing white pants while she had previously told police that the person was wearing dark pants. C.H. testified that if the police's report stated she said defendant was wearing dark pants, it was incorrect because he was wearing white pants.

¶ 48    Defendant argues that his counsel's theory of defense was that C.H.'s identification was not credible, so the failure to use the available evidence to undermine her identification was objectively unreasonable. He also argues that he was prejudiced by the error because the State's case against him had significant weaknesses and the evidence would have been even weaker if C.H.'s identification was discredited.

¶ 49    Even though defense counsel did not introduce C.H.'s full prior description of defendant at trial, counsel brought to light discrepancies from her prior identification. Counsel did not

completely fail to impeach C.H. and indeed touched on each of the discrepancies he now raises. C.H. did accurately describe some of defendant's physical attributes to police such as his weight, his eye color, and his hair style. She admitted to the flaws in her initial identification but still testified confidently that defendant was the perpetrator. The trier of fact was made aware of the differences in C.H.'s initial description and defendant's physical attributes. "To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's performance was so inadequate 'that counsel was not functioning as "counsel' " guaranteed by the sixth amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44. Defendant has failed to show that counsel's failure to fully impeach the victim constituted such unreasonable performance so as to not be functioning as constitutionally adequate counsel.

¶ 50    Even if defense counsel's cross-examination of C.H. could be considered to be objectively unreasonable, he nevertheless cannot establish the prejudice necessary to prevail on an ineffective assistance of counsel claim. As explained above, the evidence against defendant at trial overwhelmingly established his guilt. There was compelling evidence in the form of C.H. and M.N.'s identification testimony, defendant's own statement in which he admitted assaulting C.H., and other crimes evidence from three other girls defendant attacked in the same three-day span as the attack on C.H. Defendant has not demonstrated that a more complete impeachment of C.H.'s identification would probably have changed the outcome of his trial. Therefore, his claim fails. *People v. Layton*, 2021 IL App (1st) 172418, ¶¶ 91-92.

¶ 51    *Motion to Suppress Lineup Identifications*

¶ 52    Defendant argues that the trial court erred when it denied his motion to suppress the lineup identifications where the lineup procedures were unduly suggestive. In his pretrial motion,

defendant asserted that he was the only individual in the lineup who matched the descriptions of the offender given by C.H. and M.N.

¶ 53    A defendant has a due process right to fair identification procedures and is deprived of that right if, under the totality of the circumstances, the pretrial identification procedure is unnecessarily suggestive and conducive to mistaken identification. U.S. Const., amend. XIV; *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). The threshold question in deciding whether a witness's identification was so tainted by suggestive identification procedures that its admission at the defendant's trial violated due process is whether the pretrial identification procedures were indeed suggestive. *People v. McTush*, 81 Ill. 2d 513, 520 (1980). A reviewing court will only disturb a trial court's factual findings on a motion to suppress identification if they are against the manifest weight of the evidence, but the ultimate legal conclusion regarding whether suppression is warranted is a question we review *de novo*. *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 61. Evidence presented during both the suppression hearing and at trial may be considered in determining the propriety of the trial court's ruling on the motion to suppress an identification. *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 60.

¶ 54    Although all the individuals in a photo array or lineup need not be physically identical, a lineup in which the fillers appear as grossly dissimilar to the suspect is impermissibly suggestive. *United States v. Wade*, 388 U.S. 218, 233 (1967). The Code of Criminal Procedure provides that a suspect in a lineup "shall not be substantially different in appearance from the fillers based on the eyewitness's previous description of the perpetrator or based on other factors that would draw attention to the suspected perpetrator." 725 ILCS 5/107A-2(f)(3)(B) (West 2022).

¶ 55    Defendant argues that the lineup in this case was unduly suggestive where he was the only participant who matched the witnesses' description of the offender, and he stuck out from

the other participants. In particular, defendant notes that C.H. and M.N. described their attacker as a black man with dreadlocks wearing a black jacket. According to defendant, defendant was the only person in the lineup who had both dreadlocks and a black jacket. However, a review of a photo of the actual lineup shows that there were not gross dissimilarities among the lineup participants and other lineup participants could be considered to have met the witnesses' previous descriptions of the offender. Two of the men in the lineup had dreadlocks and a third had his hair in braids.

¶ 56     The fact that the offender was described as wearing a black jacket during the offense is not particularly notable vis a vis the lineup. C.H. and M.N. were called to come view a physical lineup two days after they were attacked, so they would have had no reason to suspect defendant would be wearing the same clothing. Defendant points to the combination of the hairstyle and the black jacket as being suggestive. In total, four of the five men in the lineup were wearing black jackets. This fact makes the case relied upon by defendant, *People v. Clifton*, 2019 IL App (1st) 151967, ¶¶ 8–10, unpersuasive. In fact, the other man who had his hair in dreadlocks is also wearing a black jacket.

¶ 57     In *Clifton*, a divided panel of this court found that the lineup employed in the case was unduly suggestive. All three witnesses had described the offender as having dreadlocks, a blue or black hoodie, and white shoes. One of the three witnesses also reported that the offender was wearing jogging pants and had a facial scar or facial tattoo. In finding the lineup to be unduly suggestive, the *Clifton* court noted that the defendant was the "only participant in the lineup with three particular articles of clothing, a unique hairstyle, and a facial feature matching the description of the offender." *Id*. at ¶ 62. The dissenting justice made a compelling case that the

defendant failed to meet his burden of showing that the lineup was unduly suggestive. See *id*. at ¶¶ 94-106 (Lavin, J., concurring in part and dissenting in part).

¶ 58     Here, defendant was not wearing three specific types of clothing identified by the witnesses. Defendant was not the only one wearing the particular type of clothing he identifies as problematic, four out of the five men in the lineup were wearing the type of clothing identified by the witnesses and three had dreadlocks or braids hairstyles. If a person was given the descriptions that the witnesses gave to police and then asked to view the lineup in this case, there would be no reasonable basis to conclude which of the participants was defendant.

¶ 59     Defendant points out that he was the tallest individual in the lineup, causing him to stick out. But defendant's height was not a prominent part of any witness's prior description of defendant. Moreover, as defendant pointed out in his argument about the inaccuracies in the description of him that C.H. originally gave to the police, she reported he was 5'9" or 5'10" so she was not necessarily looking for a particularly tall person or the tallest person. See *People v. Harrison*, 57 Ill. App. 3d 9, 13 (1978) (lineup was not overly suggestive when the witness described the offender as tall and defendant was the tallest one in the lineup).

¶ 60     All of the lineup participants were black males around the same age. The men were similar in size and wearing casual clothing. Nothing about defendant made him obviously stand out for identification when compared to the other lineup participants. Illinois courts have routinely rejected claims of undue suggestiveness based on height differences (*id*.), hairstyle differences (*People v. Richardson*, 123 Ill. 2d 322, 350 (1988); *People v. Hartzol*, 222 Ill. App. 3d 631, 642-43 (1991)), or the type of clothing being worn (*People v. Bragg*, 277 Ill. App. 3d 468 (1995); *People v. Lopez*, 93 Ill. App. 3d 152, 160 (1981)). Even in combination, the differences between defendant and the other lineup participants are not readily apparent. Nothing

about defendant's hairstyle, physical appearance, or clothing choices made him noticeably stand out from the other lineup participants, and we find that he has failed to meet his burden of showing that the trial court's finding that there was no undue suggestiveness was against the manifest weight of the evidence.

¶ 61    *One-Act, One-Crime Doctrine*

¶ 62    Defendant argues that his kidnapping conviction must be vacated under the one-act, one-crime doctrine. It is well established that where, as here, a defendant is found guilty of multiple offenses based on the same act, judgment and sentence may be entered only on the most serious offense, and the lesser offense should be vacated. *People v. Smith*, 233 Ill. 2d 1, 20 (2009). Defendant failed to preserve this issue for review, but the claim is reviewable under second-prong plain error review. *People v. Coats*, 2018 IL 121926, ¶ 9 ("one-act, one-crime violations fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process").

¶ 63    The State concedes that kidnapping is a lesser-included offense of aggravated criminal sexual assault predicated on kidnapping. Under the one-act, one-crime doctrine, defendant cannot be convicted of both offenses because kidnapping is a lesser-included offense of aggravated criminal sexual assault predicated on kidnapping. *People v. Reveles-Cordova*, 2020 IL 124797, ¶ 12 (criminal sexual assault is a lesser-included offense of home invasion predicated on criminal sexual assault). Defendant was convicted of committing the offense described in section (a)(4) of the criminal sexual assault statute. Section (a)(4) provides that "a person commits aggravated criminal sexual assault if that person commits criminal sexual assault and *** the person commits the criminal sexual assault during the course of committing or attempting to commit any other felony." 720 ILCS 5/11-1.30(a)(4) (West 2022).

¶ 64    Here, defendant was convicted of committing the criminal sexual assault during the course of the felony of kidnapping. In the charging document, the State expressly stated that the criminal sexual assault at issue "was perpetrated during the course of the commission of any other felony, to wit: kidnaping." Proof of kidnapping was, therefore, a necessary element of proof of the aggravated criminal sexual assault predicated on kidnapping. As defendant points out, "[g] iven that all the elements of kidnapping are inherently elements of aggravated criminal sexual assault predicated on kidnapping, the kidnapping conviction is a lesser-included offense and must be vacated."

¶ 65    The State acknowledges the error, but contends defendant is entitled to no relief because the trial court merged defendant's kidnapping conviction into his aggravated criminal sexual assault conviction. However, the record shows that the trial court entered judgment on both convictions and entered separate sentences on the two convictions. In the judgment order, there was an error in referencing what charges against defendant were represented by which counts of the charging instrument. The trial court perhaps attempted to merge the kidnapping conviction into the aggravated criminal sexual assault conviction, but the merger did not occur, and defendant was left with both convictions and both sentences on those convictions. The kidnapping conviction cannot stand as it violates the one-act, one-crime doctrine. Accordingly, we vacate defendant's kidnapping conviction.

¶ 66    *Sentencing Enhancement*

¶ 67    Defendant argues that the trial court erred when it applied a 15-year firearm enhancement to his sentence for aggravated criminal sexual assault predicated on kidnapping where no such enhancement exists for the given offense. Additionally, defendant argues that the State failed to prove beyond a reasonable doubt that he was armed with a firearm. The State concedes on appeal

that the firearm enhancement was not applicable to defendant's sentence. Here, Count 5 of the criminal complaint was for aggravated criminal sexual assault predicated on the use of a firearm. If defendant was sentenced on that count, he would have been subject to the firearm enhancement. However, the trial court entered judgment against defendant on Count 1, which was for aggravated criminal sexual assault predicated on kidnapping. The trial court then merged the other aggravated criminal sexual assault counts into Count 1.

¶ 68    The firearm enhancement does not apply to Count 1, and it was improperly applied to defendant's sentence. The State concedes the firearm enhancement should not have been applied to defendant's sentence since Count 1 did not involve defendant's possession of a firearm as an aggravating factor. See 720 ILCS 5/11-1.30(d)(1) (West 2022) (a 15-year sentencing enhancement applies where the aggravating factor is the defendant's possession of a firearm during a sexual assault). Count 1 was simply predicated on defendant's commission of an act of sexual penetration during the course of a kidnapping. See 720 ILCS 5/11-1.30(a)(4) (West 2022).

¶ 69    The State argues that, despite the trial court's sentencing error, defendant is not entitled to relief because defendant did not object to the error during sentencing and he has failed to show that he would have received a lower sentence but for the trial court's misunderstanding.

¶ 70    To preserve a sentencing issue for appeal, a defendant must raise the issue in the trial court. *People v. Woods*, 2018 IL App (1st) 153323, ¶ 24. An unpreserved claim of a sentencing error may be reviewed under plain error analysis. *People v. Richards*, 2021 IL App (1st) 192154, ¶ 11. The defendant must first show that a clear or obvious error occurred. *Id*. Then, the defendant must show that either (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so serious that it denied the defendant a fair sentencing hearing. *Id*.

¶ 71    Here, defendant has shown that a clear and obvious sentencing error occurred. The State concedes the error. Under the second prong of the plain error doctrine, we have generally held that "a trial court's misapplication of law to determine the applicable sentencing range is plain error because it affects the defendant's fundamental right to liberty." *Id*. at ¶ 31. Such relief is required even though defendant's sentence falls within the correct range. See *id*. (quoting *People v. Hall*, 2014 IL App (1st) 122868, ¶ 15) ("even when a sentence imposed under an incorrect sentencing range fits within the correct range, the original sentence must be vacated because the trial court relied on the wrong sentencing range when imposing sentence").

¶ 72    The State relies on a very recent decision from our supreme court to argue that the trial court's misapprehension of the applicable sentencing range does not entitle a defendant to plain error relief where the defendant fails to demonstrate that he would have received a lower sentence but for the court's misunderstanding. *People v. Yankaway*, 2025 IL 130207, ¶ 115. In *Yankaway*, the circuit court sentenced the defendant to 44 years in prison for attempted murder but misstated the sentencing range when it stated that the defendant was subject to a 20-year enhancement rather than the 15-year enhancement that was actually applicable. *Id*. at ¶¶ 43, 113. The supreme court explained that the defendant failed to show a clear and obvious error because it was clear the sentence was based on the seriousness of the offense and the defendant's commitment to a life of crime.

> "The [trial] court stated that Yankaway was 'overwhelmingly guilty' and that his crimes were 'stunning' because he and [the victim] were cousins and friends. And, after reviewing the aggravating factors and limited mitigation, the court found that Yankaway is 'the person that the community needed to be afraid of, but, worse than that, [] your own family, and your own friend needed to be afraid

of you' and that, 'as difficult as this is for me to say, you are the reason prisons are built.' " *Yankaway*, 2025 IL 130207, ¶ 114.

¶ 73    Unlike the error in *Yankaway*, the error here was a clear and obvious sentencing error. Here, defendant was subject to no firearm enhancement at all, and the trial court sentenced defendant under the belief that a 15-year firearm enhancement was part of defendant's sentence which the court was required to enforce. In *Yankaway*, the sentencing court merely mistook the sentencing enhancement of 15 years for a sentencing enhancement of 20 years. *Id*. at ¶ 113. In this case, while defendant's conduct was clearly appalling and horrendous, the evidence against him and the factors in aggravation and mitigation at sentencing were not as strong as against the defendant in *Yankaway*.

¶ 74    The trial court specifically noted during sentencing that defendant did not have a violent background. The trial court stated that the conduct in this case seemed to be "out of character" for defendant. Several individuals, three family members, wrote letters in mitigation on defendant's behalf. Even though defendant's sentence fell within the permissible sentencing range, it is impossible to conclude that the trial court's mistaken belief about the applicable sentencing range had no impact in defendant receiving the sentence he received. Accordingly, defendant's sentence must be vacated and the case remanded for a new sentencing hearing. *Richards*, 2021 IL App (1st) 192154, ¶ 31; *People v. Hall*, 2014 IL App (1st) 122868, ¶ 15.

¶ 75                              CONCLUSION

¶ 76    Accordingly, we affirm in part, vacate in part, and remand the case for a new sentencing hearing. Defendant's conviction on Count 1 for aggravated criminal sexual assault predicated on kidnapping is affirmed. Defendant's conviction on Count 7 for kidnapping is vacated.

Defendant's sentence for aggravated criminal sexual assault is vacated and the case is remanded for a new sentencing hearing.

¶ 77    Affirmed in part, vacated in part, and remanded for a new sentencing hearing.